It's an appeal from a judgment of the Court of Federal Claims in favor of the government. It is case number 171996. Mr. Schwartz, you just want to reserve two minutes for rebuttal, is that right? Yes, Your Honor. Okay. You may begin. Good morning, and may it please the Court. The case before the Court today involves the interpretation of the 1985 FDCA settlement agreement between the government and my client, the Hendricksons. And the issue is very simple as to whether the government is obligated to make the future payments that are set forth in the agreement or whether the government fulfilled all of its obligations. Do we rely on paragraph 3 to support your position? Yes. That the agreement unambiguously obligates the government to make future payments. But paragraph 3 says the government shall be obligated to make payment of certain future periodic payments as set forth in paragraph 5. So why doesn't the as-set-forth phrase qualify how the future payments are to be made? Your Honor, the future payments that are described in paragraph 5 are the actual dollar amounts of the future payments to be made. So that specific provision relates to those numbers in paragraph 5 as to what years and what numbers are to be paid. It doesn't necessarily relate to the manner of payment. And I think that's buttressed by paragraph 7. The discharge in this case was set forth to be incremental. What the discharge on paragraph 7 says is that the purchase of the annuity contracts and the lump sum payments, as outlined in paragraphs 5 and 6, and the payments thereunder shall operate as a full and complete discharge and satisfaction of the periodic and other payments with respect to the United States of America pro tanto. Can you cite us to any case or document that sheds light on how we should interpret a pro tanto clause? Well, pro tanto, we did, Your Honor, but pro tanto is a Latin term that has legal meaning. And it means incrementally as these things are made. And the combination of the addition of the payments thereunder and the clause pro tanto makes it. Wait. Stop. When I talk, you don't. I apologize, Your Honor. Couldn't they, the pro tanto clause, when you have payments thereunder, couldn't they just as reasonably refer to payments to purchase the annuity contracts and the lump sum payments outlined in paragraph 6? I don't think that's a fair reading of the entire agreement or of that phrase, Your Honor, because the payments thereunder clearly relate to the annuity contract, the payments that come through the annuity contract. Those are the payments that are specified in paragraph 5 that under paragraph 3 the government is obligated to make. I think if you put all those things together, it's clear what the intent of the parties was, and that was for the government to be obligated to make the payments. And just as in the Massey case, the government chose to delegate that to Executive Life, an insurance company. In a different context, I used the phrase solemn skiing in the first case. I think you're trying to get us to ski through certain gates in this contract. And if we do, if we follow your logic exactly, then that intent is shown. But there are a whole bunch of other possibilities. Well, Your Honor, I don't think you could have any clearer language than what's in paragraph 3, that the United States shall be obligated to make the future periodic payments. I think the other provision in this case that you have to look at that could not possibly fit with the other interpretation of this agreement is the section in paragraph 5 that says the government has the absolute right to change the beneficiary of the annuity. If you read this contract to say that by purchasing the annuity, the government is relieved of all its obligation, and then it has the absolute right to change the beneficiary of who gets those payments, then the entire contract is illusory. The plaintiffs never had any right to collect any of the amounts that they were to collect. So if you look at this case and look at the language that this court found in Massey, obligated the government to make the payments, the language in this case is much clearer. First of all, it explicitly says the government is required to make the obligations. Secondly, it says that the discharge is only going to happen incrementally as the payments are made. And third, it gives the opportunity for the government to change the beneficiary at any time, even immediately after the annuity is purchased. You can't read those three provisions together and say that the government was relieved of its obligation to make the payments. Do you agree with the statement in the red brief that whether contracting authority exists is not extrinsic evidence. It is something that relates to the formation of any contract with the government in the first instance. In other words, you're saying, Your Honor, whether there was authority to make this deal that the contract says. I think that's the argument that the government has defaulted to after the Nutt decision, is that the AUSA only had $900,000 of authority. I'm putting aside whether that's a separate issue to be addressed, like the Court of Federal Claims seemed to treat it, or whether it is part of the overall contract interpretation. I mean, there are some basic principles of contract interpretation. And if the existence of the authority to contract is, as the government contends, inherent in the formation of any contract with the government, isn't that a factor that we should at least consider in interpreting the contract? I don't believe so, Your Honor. I believe that's a question of fact. I think the issue of authority, in other words, the contract says what it says. So the question is, was the AUSA authorized to sign the contract that says what it says? And what they're trying to do is make a circular argument. They're trying to say the contract can't be interpreted to mean what it says because the AUSA wouldn't have authority to have done that. But the contract does say, more than once, that ultimately the government is settling for a total of $900,000, right? The contract says several things, Your Honor. It says, for instance, in paragraph five, the paragraph that is relied upon by the court below and by the government, that the payment of only $522,000 for the annuity was a complete discharge. And that isn't true even under the government's interpretation because there were two other payments that were required clearly. But the issue- Why doesn't pro tanto mean those payments? Because pro tanto is such as they are made- Yes. Is as the future payments are made. The payments there under- There's three payments. Yes, but the payments there under is clearly relating to the annuity. That's what's- it follows the statement about the purchase of the annuity right there. And so the use of pro tanto, there's no reason to insert pro tanto. And again, I get back to you, Your Honor. If just as in the Nutt case, this court held that there were certain provisions that would make absolutely no sense under a contrary interpretation of the contract, the provision to allow the government to change the beneficiary after buying the annuity makes no sense if the government is completely off the hook by buying the annuity. The government's going to argue that the reason they had to own it and have free reign is so that your client could get the payments tax-free. And that's a false argument because the only provision under the tax code that protects the taxability is the ownership of the annuity. The plaintiffs cannot own the annuity. Anyone else can own the annuity. But the change of beneficiary is not anywhere in the tax code. We cite it to the section of the tax code. There's nothing in the tax code that says that the government or the owner of the annuity has the right to change the beneficiary. And there are provisions in the tax code that actually the government could have utilized, which is the absolute assignment. And that can be done- a qualified assignment can be done with the permission of the plaintiffs to say that the obligation is now going to be the insurance company's obligation. But that wasn't done here. The government had a choice to do it. And in the Nutt case, the government did do it. The government- the Nutt case shows how a contract that is going to relieve the government of obligation by buying the annuity can be written. But none of that was present here. And I think that the other- the argument here is that there's different interpretations. I respectfully disagree that you can read that section that says the government's obligated to make future payments as saying that that does not obligate the government to make future payments. But if you did say that, then you have to turn to saying that our interpretation is equally reasonable as the government's interpretation. And if we do that, then the doctrine of who drafted the agreement has to apply here, just as it did in the Massey case. Because if our- if their- Does that doctrine apply in the setting of a negotiated contract? It does, Your Honor. And the only exceptions to it under a negotiated contract is if the ambiguous terms can be shown were specifically negotiated. So if two parties- the case is cited by the government. If two parties negotiate a particular term, and there's evidence that they negotiated that term, and then later the court decides that specific term is ambiguous, then the- But this contract certainly was a negotiated contract. Sure, Your Honor. But it wasn't like a government procurement contract that has standard provisions in it. No. And in fact, what I think this case shows is that the government didn't tend to use standard contracts when it came to these agreements because they're all so different. But the point is that the only- the important terms that were negotiated were the amounts of money to be paid and who was going to pay them and when they were going to be paid. The other language was provided explicitly by the government, and the only evidence in the record of that is the declaration of the attorney that was involved. There's no other evidence in the record that suggests otherwise. And that declaration is on page 94 and 95 of the record. Clearly says- Sorry to jump in on you there, but I did want to just go back to something you were arguing in support of your case. You point to the provision in paragraph 5 at appendix 21 that says, The defendant shall be the sole owner of the annuity and shall have all rights of ownership, including without limitation the right to change the beneficiary. How, in your view, does that equate to the obligation that you're seeking to impose here? Namely, that the government has to make up the shortfall that resulted from the financial problems of ENLI. The government's plan here is set forth clearly in the settlement agreement as well as the accompanying assumption and assignment agreement. And that was that they were going to purchase the annuity through this subsidiary of Executive Life, first executive corporation, and then they were going to assign their obligation under the agreement to pay the plaintiffs to that insurance company. And that did happen. There's evidence in the record that that agreement was sent forward. What that agreement- Are you talking about the document in 307? Yes, the assignment and assumption agreement. I'm sorry, there's two documents. One that's a signature and one that's kind of unreadable. Yes, the unreadable document is what the government has produced. It's called an absolute assignment document. And that is simply a document that transferred the ownership of the annuity to first executive corporation. You're talking about the document, then, when you say the assignment and assumption, the one at 287? The assignment and assumption agreement, Your Honor, is at- Oh, it's at- It's at 133, 134. I apologize. And what that agreement did, and clearly by its terms, it recites that a separate agreement was entered into between the plaintiffs and the government and that the government is obligated to make certain future payments to the plaintiffs, and they're assigning that obligation to first executive corporation, and first executive corporation was paid $1,000 to do that, and also then the absolute assignment, the fuzzy document at 307, was signed to turn over the ownership of the annuity to first executive. Now, think about it, Your Honor. If there was no obligation of the United States to pay the future payments and there was no obligation ever for first executive corporation to make the payments to the plaintiffs, then how could the government have just turned over the annuity to the insurance company with no strings attached to it? So, obviously, the assignment assumption agreement was executed together with the absolute assignment, which then transferred the obligation under the agreement in this case to make the future payments to the insurance company. The key element there is the plaintiffs were not a party to that assignment. That assignment could only be effective against the plaintiffs. I read that, leaving aside whether it's signed or not, but in looking at that, just on its face, it seemed to me I had read that document as a document to facilitate the annuity arrangement that was contemplated by the basic settlement agreement. Yes, Your Honor, it is. I see how it really makes that much of a difference on the government's, on the obligation which you're seeking to impose upon the government. Well, the reason that it makes a difference, Your Honor, is because in that document it recites the intent of the parties and particularly the intent of the government to be obligated to make the future payments because it says the government signed an agreement with the plaintiffs that obligated it to make future payments Via the annuity. Via the annuity. Well, it doesn't say that, Your Honor. It doesn't say via the annuity. No, no, but the basic settlement agreement seems to say via or through the annuity arrangement. Because that's exactly what happened in Massey. In other words, the government delegated its obligation. It didn't eliminate its obligation. It delegated its obligation. And that's what it did here. The government delegated its obligation and the Assignment Assumption Agreement makes that clear because it states that. That it's the government's obligation. In other words, at the time the Assignment Assumption Agreement is entered into, the government has already obligated itself to make these future payments. Now it's taking this agreement and transferring and delegating that obligation to the insurance company. Did the government make a claim on behalf of the Hendricksons in connection with the winding down of the insurance company? No, the government hasn't taken any action at all. And that amount is being held in escrow, actually. Whatever the liquidation amount is from the Liquidation Bureau, that's being held in escrow pending the outcome of this case. But if the government owns the annuity, why wouldn't the government be the one that should be taking action with respect to that insurance company? The government didn't own the annuity anymore. Based upon that absolute assignment, they transferred it to first executives. Who made a claim? Anyone? No claim has been officially made. There have been offers made by the Liquidation Bureau. And again, that amount is being held in escrow pending the outcome of this case. And the plaintiffs continue to get 50% of their payments. And they get a subsidy or whatever you'd call it from the insurance industry entity as well. Yes, but much less than they're entitled to under the agreement, yes. Did they make that claim? Yes, and again, that claim is contingent on what happens in this case because there's a right of the Liquidation Bureau to reclaim their money in the event that we're successful in this case. So that amount is being held in escrow. But it's certainly not an amount that's going to satisfy the judgment here. And I want to point out that, again, the assignment and assumption agreement is important because it sets the context of what this agreement was. You know what, I just realized you're way over your time. So I'm going to give you two minutes for rebuttal, but we've got to move on. Thank you. Good morning. On behalf of the United States, we ask that this court affirm the decision of the trial court. If we find the agreement unambiguous, is it your position that we can still use that extrinsic letter from the then acting assistant attorney general? Our position is that the agreement is plain and unambiguous. But as Judge O'Malley had mentioned earlier, the element of authority to contract is an element of contract formation in the first instance. So before any court gets to whether or not there has or hasn't been a breach of an agreement, the plaintiff appellants in this case have to prove that the agreement exists in the manner that they purport it exists. So they have to prove a duty, an obligation, a promise arising from that duty, a breach, and in the instance of contracts with the United States government, that the United States representative who entered that contract had the actual authority to have done so. And in this case, as the trial court found, the undisputed evidence shows that the assistant U.S. attorney who entered this settlement had actual authority that was clearly and indisputably capped at $900,000. Let me ask you a question. What if this insurance company had gone belly up within the first year or two? Would these people just be completely out of luck? It didn't happen, so I can't say for certain. But theoretically, yes. I mean, they contracted for the purchase of an agreement, for the purchase of annuities. That purchase was made by the United States government. The AUSA had authority to disperse $900,000, and they did so in the form of cash payments to the Hendrickson's at settlement, attorney's fees, which were under the FTCA limited to 25% of the value of settlement. In this case, the Hendrickson's attorney's got $225,000, which is 25% of $900,000. The AUSA has authority to settle and the purchase of annuities. In NUT, we distinguish Massey on two grounds, one of which is that in Massey, the agreement said that the annuity payments were guaranteed for 15 years. Here, this agreement says the annuity payments are guaranteed for 40 years. So that's the first ground. So that puts you closer to Massey with respect to that issue than it does NUT. Also, we distinguish it on the grounds that the parties actually contemplated in the agreement in Massey that there would be – I'm sorry, contemplated here as opposed to the agreement in Massey, in NUT, as opposed to the agreement in Massey, that there could be a problem with the insurance company, and the government actually said that they would help sue the insurance company and help the party. So everybody was contemplating that this kind of circumstance could happen. The court pointed out in Massey that the government had retained the control of the annuity or ownership of the annuity. So now we've got two important factors upon which we in NUT distinguish Massey, and both of those exist in this case.  That was a long question. I understand. Yes, Your Honor. So Massey is distinguishable on a number of bases. So you're correct that in NUT, this court distinguished Massey based on the finding that Massey had this guarantee language, and that same guarantee language is present in the Hendrickson's agreement. However, the guarantee phrased in Massey was phrased following the first clause, which is that distributions – and this appears twice in the Massey agreement – that distributions of the future annuity payments would be made on behalf of the United States. That on behalf phrase appears twice in the Massey agreement. It nowhere appears in the Hendrickson agreement or in NUT, and that is a critical difference. But our court in NUT did not rely on that language to distinguish Massey. It relied on the guarantee language. It relied on guarantee language, but also – yes, but that's not to say that there are not additional reasons for the two agreements to be – in NUT, the court is looking to distinguish what were the critical phrases in the court's view and NUT from the critical phrases in Massey. All of these agreements have some terms in common, but they're not identical, and that's why we have to come back to this court. You're suggesting, Ms. Finan? Finan, yes. Ms. Finan, you're suggesting, Ms. Finan, that that on behalf of language that appeared in Massey shows the insurance company there just acting as sort of a pay agent for the government. Is that the idea as opposed to an annuity type of thing? That's correct. So in NUT, the court recognized that there were these distributions on behalf of the United States in the Massey agreement, and that phrase is not here in Hendrickson. I'll also point out that the Hendricksons in the trial court below expressly waived any claim for a guarantee, and that's at Appendix 486. They are claiming in this litigation that the United States government had a direct payer responsibility for this future annuity payments. They have expressly waived and disclaimed any allegation that the Hendrickson agreement is a guarantee. Well, but they're not disclaiming that the fact of the reference to the payments being guaranteed isn't relevant to the question of whether the parties contemplated that the government would be making these payments. That's a different guarantee theory is different than relying on the guarantee language for interpretation of the contract. Understood. But this court in Massey found that there was a guarantee. Where's this language? You say they waived a guarantee? It should be Appendix 486. Because I don't have a 486. Maybe I do. Hold on. I might be mixing up my numbers. 468, I'm sorry. 468, okay. 468. It's a reply brief filed at the trial court. Reading from that, it's page 5 of the Hendrickson's reply. As an initial matter, plaintiffs herein do not argue that the stipulation requires the United States to, quote, guarantee the future payments to be made to the United States. Right. No, what they said is that they're not saying that the United States is the guarantor of someone else's obligation. They're saying it was the United States' obligation, but that the guarantee language helps support their argument that it was the United States' obligation. Understood. Yes. Okay. But going back to your initial question about whether or not this case is closer to Massey than it is to not, so as I've mentioned, I think one critical difference is Massey's use of the phrase on behalf of distributions on behalf of the United States, which appears twice in Massey. In addition, actual authority was not at issue in Massey. Neither of the parties challenged or there was no disagreement or argument as to the scope of the military secretary's authority to have entered that agreement. That is not the case in Hendrickson. Hendrickson was settled under the Federal Tort Claims Act as opposed to the Military Claims Act, and there are very specific statutes and regulations that delegate actual authority. We specifically rejected the notion that that is grounds for distinguishing the two cases. We said the government argues that because one was under the Military Claims Act and the other is under the Federal Tort Claims Act, that's an important distinction. We said we don't buy it. Respectfully, Your Honor. We said no. Understood. Yes. But that, as the United States read the Knott decision, that refusal to distinguish Massey and, in that case, Knott on the basis of Military Claims Act versus Federal Tort Claims Act was in the context of the United States government's argument at that stage of the proceedings that the Federal Tort Claims Act, as a matter of law, prohibits the government from entering into agreements that involve future distribution of damages. It was a sovereign immunity argument, and on that grounds, the Federal Circuit was not persuaded by the government's argument that the Military Claims Act was different in that regard. I'm arguing something slightly different here in that actual authority. So taking a step back, this Court found in Knott that the Federal Tort Claims Act does not prohibit the United States government from entering into compromises or settlements that involve the future distribution of money. We argued otherwise. The Court disagreed that that holding is firm in Knott. We understand that. But whether or not the Federal Tort Claims Act, as a general matter, does not prohibit the United States government from entering into settlements that involve the future distribution of funds, does not answer the second half of the inquiry whether or not that happened or can happen in an individual case. So even taking the Knott's general proposition that these sort of contingent settlement agreements with structured settlements are not prohibited by the FTCA, we then look to an individual case to determine whether or not it happened in that case. And so in Knott, the Court, yes, found that as a general matter, the U.S. government could enter these sorts of agreements, but then looking at the plain language of Knott found they had not done that in Knott. They didn't need to reach actual authority because they found based on the plain language that it wasn't relevant. Let me direct you a little bit differently. In contrast to your friend on the other side, in the red brief, the government argues that pro tanto was shorthand reference to Paragraph 5's schedule of future sums when I raised them, the payments, quote, per end, the payments there under, which would be paid by the annuities in varying degrees only for so long as those payments might last, pro tanto. Same question I asked him. How do we know that? What's your authority? Your Honor, so all we have is vis-à-vis a definition of pro tanto or dictionary definitions. That was all the parties ever offered to the trial court. It's all that's cited to in this brief. We couldn't find anything. We looked, believe me. Understood. But I would submit that the United States' interpretation of pro tanto is not only consistent with the plain language of the definition of the Latin term, but also consistent with the rest of Paragraph 7 as well as the rest of the agreement as a whole, and that would be what the government offers is the additional evidence of the meaning of pro tanto, right? This Court, it's well established, does not read, does not cherry pick and read individual words and phrases. I already asked those questions about the ensuing paragraphs. I mean, whether or not pro tanto specifically, that meaning is clear or unclear, I don't think it changes the unambiguous meaning of the agreement as a whole when you read all of those provisions together, right, that we've got consistent with not the same phrasing, annuities which will pay, which this Court found, given the syntax of that sentence, the fairest reading, is that it was the annuities that would be responsible for future payments, not the United States. We have that same language as in not, which we have argued brings this settlement agreement closer to Hendrickson than to Massey. We also have caps, like in Paragraph 7, and I'm reading from Paragraph 7, Appendix 304, the purchase cost, parentheses, premium of the annuity contracts and lump sum payments as outlined in Paragraph 5, those are the future payments, shall be in a total combined sum not to exceed $523,217. So even if one were to read the agreement to, in some manner, suggest that there was a future expectation of payment, that future expectation of payment was satisfied by the United States government's expenditure of $900,000 in total, or specifically as in Paragraph 7, this $523,217 to purchase the annuity. What are we to make of the fact that the trial court who presided over this case, who said that he was familiar with the terms of the agreement, who said that he had approved the terms of the agreement, what are we to make of the fact that he believed that it was a guarantee by the court that there would be 40 years of payments? Yes, Your Honor. So respectfully, that decision was vacated and reversed by the second circuit. But because they felt that he hadn't properly retained jurisdiction and so it had to be filed in a different court. Understood. But respectfully, Your Honor, that district court judge had no personal knowledge of any of the internal deliberations of the parties. All he did was enter a dismissal. Even before seeing. He spent pages talking about the fact that he knew he retained jurisdiction because he had spent time being involved in having to approve what the parties had entered into. Yes, Your Honor. And in the joint appendix, there is an excerpt of the transcript of the counsel who appeared before that district court judge. And as we quoted in our brief, those excerpts of the district court transcript reflect that counsel told the district court judge that they had a settlement in principle, that that settlement was negotiated, and that it would involve the future payment of money, but that the United States' obligation would be capped at $900,000. And so to the extent the district court judge, 30 years later, entered an opinion that he said he felt that the agreement meant something else, all he had to go on is the same transcript that you all are seeing. Wait a minute. Doesn't Article III make us omnipotent? Yes. One last question. Why are we now looking at the third version of annuity agreements with claimants from the same government? Can we not get on one page and draft an annuity agreement that does what the amendment does not have, confusing language? Yes, Your Honor. So I'm outside the record here, but I can explain to the extent I know that the use of structured settlements in these tort settlement agreements was a new thing in the early 1980s, right? This was the first time the United States government and parties were starting to use the structured settlement vehicle as a way to facilitate settlements of these claims. So in that sense, I don't know that the drafting of these agreements had quite caught up to a universal standard, or that people were as familiar with structured settlements as they are today. I would submit that I think the torts division has a much more routine blanket agreement. You're saying there is a kind of a standard form agreement now? I can speculate that there is. I can't. I agree with Judge O'Malley. It would certainly be helpful if you had that kind of an agreement that spelled out all of this. And then the parties would know exactly what they were getting or not getting when they signed it. Understood. And, Your Honor, I do have it on some authority from the torts division and the Department of Justice that these agreements now do specifically explain that the United States is not responsible for future payments. That that is in these current agreements. But the five or six of these breach of settlement agreements that are slowly winding their way up to this court were all entered between 1980 and 1985. They were entered by AUSAs in different districts across the country in different years. Occasionally, if the amount of the settlement, the authorized amount of the settlement,  the torts division was contacted in connection with that settlement. But if it didn't reach whatever was that tipping point dollar amount, they were settled more locally at the AUSAs level. And so that would be what accounts for some of these differences in terminology. Okay. Thank you. I will give you your two minutes back. Thank you, Your Honor. As you pointed out, the significant factors in not to distinguish Massey in this court's view were both the provision in the agreement, which said specifically that in the event of default, the government would participate and assist the plaintiffs in suing the insurance company. There is no such provision in this agreement. In fact, the opposite is true because the government can retain complete control and the ability to change the beneficiary. In this court in Nutt said that such a nonsensical, it would be nonsensical for the government to be required to continue to make the payments if they were, there's a specific provision that says they're going to cooperate with the plaintiff to sue the insurance company in the event of default. So clearly under the Nutt agreement, the risk of default fell on the plaintiffs. And that was clear based upon that term. What's equally clear is that the risk of default in our agreement falls on the government because of the explicit language that the government is There's no analogous language to Nutt that says that the government or the plaintiffs have any right. The government is going to cooperate with the plaintiffs to sue the insurance company. What about the $900,000 limitation? Your Honor, the authority argument is, I think, a specious one because under the statutory scheme of the, according to your opposing counsel, and I didn't look at this, but I'll assume it's true, that in open court, the court was told there was a limitation of $900,000. For the immediate payment of the, the immediate cash amount that was required for the settlement was $900,000. Is that in the, where is that in the appendix? Your Honor, it's several places in the appendix. The transcript. Okay. Nothing else. I didn't see it. The government knows. The government can say. The transcript is found, I think, beginning on a page about 283. I'm sorry, 290. 289. 289. But the point that I'm trying to make, Your Honor, is that there's no question that the AUSA did not draft this agreement. In the transcript, it indicates that the negotiations occurred at the assistant attorney general level in Washington. The AUSA was provided this agreement by Washington, and he was authorized to sign it. In his cover letter sending that agreement on, along with the assignment assumption agreement, he says all necessary authority has been obtained. So the question is not whether that he had immediate $900,000 of authority to spend. The question is whether he had authority to bind the government under the agreement as it's written. And the government seems to argue now that even if it says what it says, that they're obligated to make the payments, it can't be true because he had no authority to do that. But he had authority to sign the agreement. There's no contrary evidence that he didn't have authority to sign the agreement, and the government has made that statement that he had complete authority to sign the agreement. The agreement says what it says. It obligates the government to do it. But the transcript says what it says, too, and it says the total settlement is $900,000. I'm looking at 291. Yes, and in there it says that documents are going to be drafted, which are going to execute the agreement, and the document that was drafted after that statement is the agreement that was signed, and the parties then signed that agreement and the judge then approved it by signature. So the point is that there's a statutory scheme that basically says that any agreement by the Attorney General or his designee to pay money for a Federal Tort Claims Act case has an appropriation. It's automatically appropriated and an indefinite appropriation, and that's what the law is, and the Settlement Act, the Judgment Act, actually also puts that into play to prevent the government from being delayed in making payments. So there's no issue that if the AUSA had authority to sign the agreement and the agreement binds the government to spend more than $900,000, there's clearly appropriation authority to pay that because the statutory scheme sets that up. So the issue is not $900,000. That's different from what, leaving aside what authority may exist for something, that's different from what authority was available to the AUSA in this particular case. My argument, Your Honor, is that the AUSA's authority was to spend $900,000 immediately and to execute this agreement, which had a contingency possibility that it could pay more in the future. And as long as that agreement states what it says, then you can't bootstrap your argument to say that the clear terms of the agreement don't count because the AUSA couldn't have had authority to sign that because there's no evidence that he didn't have authority to sign that. Counsel will take your argument under advisement. Thank you.